Commonwealth vs. Ryan J. Cabral
(and thirty-six companion cases[1]).

Bristol. October 5, 2004. - January 4, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Bail. Surety. Kidnapping. Assault by Means of a Dangerous Weapon. Assault and Battery by Means of a Dangerous Weapon. Assault and Battery.*

This court concluded that a bail surety and his agents have the lawful authority to apprehend, detain, and deliver a principal to a court house [174-178]; moreover, in a criminal action arising from such actions, a defendant surety bears only the burden of raising the defense of lawful authority, after which the Commonwealth must prove beyond a reasonable doubt that he was not a surety, while a defendant claiming lawful authority as a surety's agent is entitled to a jury instruction on that defense only if there is evidence sufficient for a rational jury to find that he was a surety's agent, and if there is, the Commonwealth must prove beyond a reasonable doubt that the agency relationship did not exist or that the defendant acted outside the scope of the agency relationship [178-182].

This court concluded that in apprehending, detaining, and surrendering a principal to a court or jailer, a bail surety and his agents may use only such force as an ordinary, prudent, and intelligent person with the actor's knowledge would have believed necessary in the circumstances, which may in any event never exceed the force a police officer would be justified in using in executing an arrest. [182-185]

Indictments found and returned in the Superior Court Department on July 2, 2002.

A motion to dismiss was heard by *John P. Connor, Jr.,* J., and questions of law were reported by him to the Appeals Court.

The Supreme Judicial Court granted an application for direct appellate review.

*Alison R. Bancroft,* Assistant District Attorney, for the Commonwealth.

*Carlo A. Obligato,* Committee for Public Counsel Services

[1]Four each against Ryan J. Cabral, Brian J. Rosonina, Nathan W. Martin, and Phillipe N. Lima; five each against Sharik Mendes, Brandin A. Gonsalves, Robert A. Feliciano, and John Ferreira.

(*John L. Holgerson*, Committee for Public Counsel Services, with him) for the defendants.

MARSHALL, C.J. We granted the defendants' application for direct appellate review of two questions a Superior Court judge reported to the Appeals Court[2] in connection with his reconsideration of his earlier decision denying the defendants' motions to dismiss the indictments:

> 1. Whether the defendants, either acting as a Massachusetts surety posting bail for a principal or acting as agents for that surety, may raise as an affirmative defense that they possess the lawful authority to apprehend, detain, and deliver the principal to the court house?

> 2. If the surety and his agents have the authority to apprehend, detain, and deliver the principal to the court house, what are the standards for determining whether they acted within the bounds of that authority?

For the reasons discussed below, the answer to Question 1 is "Yes." As to Question 2, a surety[3] and his agents may use only such force as is reasonable in the circumstances to apprehend, detain, and deliver the principal to the court house, which shall in any event not exceed the force a police officer would be justified in using to execute an arrest warrant in analogous circumstances. Moreover, any use of force must be preceded by sufficient notice to the principal.

1. *Background.* The Commonwealth has charged the defendants, a surety and his alleged agents, with kidnapping, G. L.

---

[2] Rule 34 of the Massachusetts Rules of Criminal Procedure, 378 Mass. 905 (1979), provides in pertinent part: "If, prior to trial . . ., a question of law arises which the trial judge determines is so important or doubtful as to require the decision of the Appeals Court, the judge may report the case so far as necessary to present the question of law arising therein. If the case is reported prior to trial, the case shall be continued for trial to await the decision of the Appeals Court."

[3] "The party who posts the required amount of bail is commonly called the 'bail bondsman' or 'surety,' and in older cases is referred to simply as the 'bail.' The 'principal' is the person who has been arrested and is released . . . pending his scheduled court appearance." *State* v. *Nugent*, 199 Conn. 537, 544 n.5 (1986).

c. 265, § 26; conspiracy to commit kidnapping, G. L. c. 274, § 7; assault by means of a dangerous weapon, G. L. c. 265, § 15B; and assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A. In addition, two defendants are charged with assault and three with assault and battery, G. L. c. 265, § 13A (a). The charges stem from the defendants' apprehension, detention, and delivery to Superior Court of a principal to exonerate bail after the principal did not appear at a court hearing. The primary facts of record, which were the only facts before the judge as he ruled on the defendants' motions to dismiss, are the grand jury minutes, which we summarize.[4,5]

On June 29, 2001, the defendant Phillipe Lima, and on November 9, 2001, Michael Correia, not a defendant in this case, posted $10,000 cash bail each as sureties for charges then pending against the principal.[6] On February 28, 2002, the principal failed to appear at a court hearing in his case. He claims he was not present because his lawyer had told him he need not appear on that date. The record does not indicate whether the principal's absence resulted in a default.

On the evening of March 6, 2002, after playing basketball, the principal left a recreation center with a friend and one of the defendants, Sharik Mendes. They stopped at the house where Mendes's brother lived. As the principal entered the kitchen, the defendant Brandin Gonsalves lunged at him, pointed a gun at

[4]Although grand jury proceedings are secret, see, e.g., *WBZ-TV4* v. *District Attorney for Suffolk Dist.*, 408 Mass. 595, 599-600 (1990), we may summarize pertinent facts contained in the grand jury minutes. See, e.g., *Smith* v. *Commonwealth*, 386 Mass. 345, 345-347 (1982) (describing facts contained in grand jury minutes). See also *Globe Newspaper Co.* v. *Police Comm'r of Boston*, 419 Mass. 852, 865-866 (1995) (summarizing interests protected by maintaining secrecy of grand jury proceedings).

[5]We express no view as to the veracity of the facts, which have not been tested by cross-examination. See *Commonwealth* v. *Colon*, 408 Mass. 419, 443 (1990), quoting *Hoffa* v. *United States*, 385 U.S. 293, 311 (1966).

[6]The record does not indicate whether Lima was registered as a professional bondsman, or if he was required to do so. General Laws c. 276, § 61B, requires an individual to register if he proposes to become a surety either "for hire or reward" or on more than "five separate occasions" in a calendar year. Hence, a defendant's friend or family member need not register prior to posting bail. The principal apparently was not a close acquaintance of Lima's: the principal met Lima in 1998 or 1999 when the principal was friendly with one of Lima's cousins.

his chest, and said, "Oh, you're going to run on my bail? [Expletive] that." Several other people grabbed the principal, slammed him face down to the ground, and handcuffed him with his arms behind his back. Several of the defendants, including Ryan Cabral, John Ferreira, Robert Feliciano, and Mendes, were present during, or participated in, this encounter. Various of the defendants later participated in moving the principal to two other locations,[7] detaining him overnight. During this time, the defendants kept the principal handcuffed, at all times in the presence of at least one person armed with a gun. The following day the defendants surrendered the principal at the court house.[8]

2. *A surety's lawful authority.* To answer Question 1, we must resolve two related questions. First, do a surety and his agents have the lawful authority to apprehend, detain, and deliver the principal to the court house? As to that, the Commonwealth argues that no such authority exists because the Legislature has statutorily abrogated the common law that recognized such authority. Second, assuming such lawful authority exists, implicit in the judge's use of the phrase "affirmative defense" is a second question: how should a court allocate between the parties the burden of proving whether a defendant is or is not a surety or surety's agent? We address each in turn.

(a) *Existence of lawful authority.* We commence our discus-

---

[7]The principal was first taken to a car and driven, along with the defendants Cabral and Feliciano, to the house where Ferreira lived. There the principal, still handcuffed, was taken upstairs and placed on a couch. The defendants Gonsalves and Ferreira soon arrived, as did the defendants Nathan Martin and Brian Rosonina. Mendes was also present. One and one-half hours later, after learning that the principal's mother was looking for him, Gonsalves, Cabral, and one other person walked the principal to a house where Gonsalves's cousin lived. The principal was kept handcuffed to a radiator at that location overnight.

[8]Lima, along with the other defendants, drove the principal to Superior Court. They removed the handcuffs outside the court house and escorted him into the building by grabbing his arm and surrounding him so that he could not escape. They delivered him into custody and exonerated the bail. The principal complained to the officer who took him into custody that the defendants' handcuffs had injured his wrists; he did not complain of any other injury. Photographs of the principal's wrists showed injuries consistent with the use of handcuffs.

sion with a brief overview of the common law concerning the authority of a bail bondsman or surety to surrender his principal. See note 3, *supra*. At common law, a surety had "the custody of the principal, and may take him at any time, and in any place." *Commonwealth* v. *Brickett*, 8 Pick. 138, 140 (1829). He was permitted to seize the principal himself or to engage an agent to do so, without resort to the legal system. *Id.* Accord *Tailor* v. *Trainor*, 83 U.S. (16 Wall.) 366, 371 (1872). See *Commonwealth* v. *Wilkinson*, 415 Mass. 402, 404 (1993).[9] The surety could use such force as might otherwise result in civil or criminal liability: "If the door [to the principal's dwelling] should not be opened on demand at midnight, the bail may break it down, and take the principal from his bed, if that measure should be necessary to enable the bail to take the principal." *Commonwealth* v. *Brickett, supra*. The principal was presumed to consent to, and the State presumed to authorize, the surety's use of such force. See, e.g., *Commonwealth* v. *Stuyvesant Ins. Co.*, 366 Mass. 611, 614-616 (1975) (explaining that "the surety legally obtains sufficient control over the principal to . . . surrender the principal in discharge of the surety's obligation to the Commonwealth" and that "[t]here is an implied term in the contract that the Commonwealth will not interfere with the surety's custody of the principal"); *Commonwealth* v. *Brickett, supra* at 140-142. See also note 12, *infra*.

The Commonwealth argues that two statutes originally enacted in 1863 have supplanted the common law just described. See G. L. c. 276, § 68[10] (concerning surety's right to surrender

[9]For a more extended discussion of the subject, see *Commonwealth* v. *Brickett*, 8 Pick. 138, 140-142 (1829). See also Drimmer, When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System, 33 Hous. L. Rev. 731, 740-757 (1996).

[10]General Laws c. 276, § 68, provides, in pertinent part: "Bail in criminal cases may be exonerated at any time before default upon their recognizance by surrendering their principal into court or to the jailer in the county where the principal is held to appear . . . . They shall deliver to the jailer their principal, with a certified copy of the recognizance, and [the principal] shall be received and detained by the jailer . . . ."

The certified copy of the recognizance is needed to protect from possible civil or criminal liability anyone who takes the principal into custody. Without this requirement, "when a bondsman appears at a jail to surrender a person

principal before default); G. L. c. 276, § 69[11] (concerning surety's right to surrender principal after default). In the Commonwealth's view, *Commonwealth* v. *Brickett, supra*, "is no longer good law in Massachusetts" and, while a surety is "entitled" to return of any money posted as bail when he surrenders the principal to an appropriate official, "this entitlement does not give to a surety the right to arrest," which, according to the Commonwealth, "except in the rarest of cases, the Commonwealth reserves for itself."

We do not agree for several reasons. Neither statute expressly codifies, modifies, or abrogates the scope of the common-law right of a surety to apprehend and detain the principal in order to exonerate bail. Nor does either statute place any limits on a surety's actions while effecting a surrender. Stated differently, the statutes leave unexplained how the surety is to "obtain[] sufficient control over the principal" so as to complete the surrender. *Commonwealth* v. *Stuyvesant Ins. Co., supra* at 615. Rather, the statutes describe the administrative protocol that the surety must follow to recover his deposits. The statutes address aspects of the relationship between the Commonwealth and the surety; they do not address the relationship between the principal and the surety or purport to govern how the surety may exercise custody over his principal.[12]

Our conclusion is consistent with the settled rule of statutory construction that "[a] statute is not to be interpreted as effecting

---

who has been out on bail, the bondsman has nothing to show that the man in custody should be legally returned to jail. . . . [T]he bondsman should have a certified copy of the recognizance in order to protect [him and the jailer]." Notes from Judicial Council explaining House Doc. 1927 (1964), the enactment of which restored this requirement after it had been struck in 1962. Thirty-ninth Report of the Judicial Council, Pub. Doc. No. 144, at 64 (1964).

[11]General Laws c. 276, § 69, provides, in pertinent part: "Bail may surrender their principal at any time after default made upon the recognizance . . . in the manner provided in the preceding section . . . ."

Because it is not apparent from the record whether the principal was in default, it is unclear whether § 68 or § 69 applied to his surrender.

[12]We have explained that "[t]he contracts on the bail bond form a triangular pattern. In addition to the undertaking between the surety and State, obligations run between the principal and the State and between the surety and the principal." *Commonwealth* v. *Stuyvesant Ins. Co.*, 366 Mass. 611, 614 n.4 (1975). General Laws c. 276, §§ 68 and 69, address only one side of this "triangular pattern."

a material change in or a repeal of the common law unless the intent to do so is clearly expressed." *Eyssi* v. *Lawrence*, 416 Mass. 194, 200 (1993), quoting *Riley* v. *Davison Constr. Co.*, 381 Mass. 432, 438 (1980). We see no clear expression of legislative intent to abrogate the common law concerning the surety's right to exercise custody over his principal.[13] To the contrary, as recently as 1999, members of the Massachusetts House of Representatives implicitly recognized that a surety has a broad right to capture and detain his principal, and proposed legislation to limit it. See An Act Relative to Bounty Hunters, So-Called, 1999 House Doc. No. 1481 (providing that individuals "engaged in the business of recapturing prisoners released on bail who have defaulted shall register with the Department of Public Safety prior to undertaking any such activity," requiring such individuals to "notify the local police department and request its assistance prior to such undertaking," and affording such prisoner "all the constitutional and statutory rights he would be entitled to if arrested by a police officer").[14]

It is therefore to the common law that we look to answer the reported questions. It is beyond dispute that the common law provides that the surety may raise as a defense to a charge of criminal conduct his right to apprehend his principal and deliver him to the court house. See, e.g., *Commonwealth* v. *Wilkinson*, *supra* at 408. Of course, a surety's right to use force in exercising custody over a principal is not unfettered, an issue we address in our answer to Question 2.

We recognize that there are compelling public policy reasons why the Legislature may seek to curtail further the common-law authority of a surety to apprehend and detain his principal in order to exonerate bail. The Legislature has already made such a determination with respect to the apprehension and deten-

---

[13]The Commonwealth points out that in *Commonwealth* v. *Wilkinson*, 415 Mass. 402, 407 (1993), this court held that "the common law right of a bondsman to seize a principal for surrender was abrogated" by the Legislature's 1937 adoption of the Uniform Criminal Extradition Act, G. L. c. 276, §§ 11-20R. A more complete statement of our holding is that the "right to seize a principal *within the Commonwealth for surrender in another State*" was abrogated (emphasis added). *Commonwealth* v. *Wilkinson*, *supra* at 405, 407. Here, the seizure and surrender took place within Massachusetts.

[14]The House sent the bill to the Committee on House Rules and took no further action on the bill.

tion of individuals in response to a request that they be surrendered to another State. See Uniform Criminal Extradition Act, G. L. c. 276, §§ 11-20R. The Legislature also has had before it proposed legislation to curtail the authority of a surety to apprehend his principal unless he acts in concert with a local police department. In our response to Question 2 we explicate limits imposed by the common law on the surety's authority, limits designed to minimize harm both to the principal and to the public. But we have no authority, for example, to order sureties to register with the Department of Public Safety or to order local police to assist sureties in the exoneration of their bail. Cf. 1999 House Doc. No. 1481; note 20, *infra*. Further limitations to that effect must be imposed by the Legislature.

(b) *Allocation of burdens.* The reporting judge asks whether the defendants may raise their lawful authority as surety or agents as an "affirmative defense" to the charged offenses. This necessarily requires resolution of whether a claim of "lawful authority" is an *affirmative* defense and, if so, the proper allocation of burdens that such a defense may raise in these criminal proceedings.[15] We have not previously been asked to consider the question in the context of bail exoneration and take this occasion to address the allocation of the burdens of production and persuasion in such cases.

The phrase "affirmative defense" is a term of art. The Model Penal Code (code), which we on occasion have used to guide our interpretations of Massachusetts law, see, e.g., *Commonwealth* v. *Klein*, 372 Mass. 823, 830 (1977), defines an af-

---

[15]At common law, the defendants bore the burden of proving affirmative defenses in all cases. See *Commonwealth* v. *McLaughlin*, 431 Mass. 506, 526 (2000) (Spina, J., concurring), quoting *Patterson* v. *New York*, 432 U.S. 197, 202 (1977). This remains the general Massachusetts rule in civil cases. See, e.g., *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 548-549 (1997), and cases cited. In criminal cases, however, we generally have required the prosecution to prove the absence of properly raised affirmative defenses. See, e.g., *Commonwealth* v. *McLaughlin*, *supra* at 526-530 (Spina, J., concurring) (reviewing history of this shift with regard to insanity defense); *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 687-688 (1976) (Commonwealth must prove absence of self-defense in murder case once defendant raises reasonable doubt on issue). But see note 18, *infra* (discussing statute placing burden on defendant of proving license or authority as justification).

firmative defense as one that "involves a matter of . . . justification peculiarly within the knowledge of the defendant on which he can fairly be required to adduce supporting evidence." Model Penal Code § 1.12(3)(c) (1985).

Because the absence of lawful authority or justification is an element of each of the crimes charged, the Commonwealth must prove beyond a reasonable doubt that each defendant acted without lawful authority or justification.[16,17] Cf. *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 687-689 (1976) (in murder cases, Commonwealth has burden of proving that killing was "unlawful"). However, where a defendant asserts an "affirmative defense," he takes on a burden of production, because the Commonwealth has no burden of disproving an affirmative defense "unless and until there is evidence supporting such defense." Model Penal Code § 1.12(1), (2). If the defense is "affirmative," once a defendant raises the defense to a charge and the defense is supported by sufficient evidence, the defendant is entitled to have a jury instruction on the defense, and the Commonwealth has the burden of disproving the

[16]General Laws c. 265, § 26, provides, in pertinent part: "Whoever, *without lawful authority*, forcibly or secretly confines or imprisons another person within this [C]ommonwealth against his will . . . or forcibly seizes and confines or inveigles or kidnaps another person, with intent either to cause him to be secretly confined or imprisoned in this [C]ommonwealth against his will . . . shall be punished by imprisonment in the [S]tate prison for not more than ten years or by a fine of not more than one thousand dollars and imprisonment in jail for not more than two years" (emphasis added). See Model Penal Code § 1.13(9) (1985) (providing, in pertinent part, that " 'element of an offense' means . . . such attendant circumstances . . . as (a) is included in the description of the forbidden conduct in the definition of the offense; or . . . (c) negatives an excuse or justification for such conduct").

[17]With respect to the crimes of assault, assault by means of a dangerous weapon, and assault and battery by means of a dangerous weapon, the Commonwealth must prove as to each that the defendant acted without justification. See, e.g., *Commonwealth* v. *Appleby*, 380 Mass. 296, 306 (1980); *Commonwealth* v. *McCan*, 277 Mass. 199, 203 (1931). If a defendant successfully establishes lawful authority as a defense against a kidnapping charge, the exercise of such authority would provide a justification defense to these other charges, so long as he acted within the scope of that authority, as we describe below. Cf. *Commonwealth* v. *Klein*, 372 Mass. 823, 834 (1977).

As to the conspiracy charges, the Commonwealth must prove that two or more persons agreed to capture and detain the principal without lawful authority, or that they agreed to use "unlawful" means to do so. See, e.g., *Commonwealth* v. *Bessette*, 351 Mass. 148, 152-155 (1966).

defense.[18] Cf. *Commonwealth* v. *Lopes*, 440 Mass. 731, 740 (2004) (self-defense in murder case); *Commonwealth* v. *Epsom*, 399 Mass. 254, 257 (1987) (same); *Commonwealth* v. *Klein*, *supra* at 831 (deadly force during citizen arrest).

We cannot say that the "lawful authority" of the surety himself (as opposed to his agents) to apprehend, detain, and deliver his principal is an *affirmative* defense to kidnapping. When a defendant in a criminal case is released on bail, the person authorized to take bail — a clerk, magistrate, or bail commissioner — retains a copy of the recognizance form signed by the surety and the principal, and by signing the form he attests that he has furnished the principal with a copy. Because a recognizance is a matter of record, the prosecution reasonably can be expected to produce a copy of the form indicating who posted a principal's bail. See, e.g., G. L. c. 276, § 61 (providing, in pertinent part, that "[i]f bail is taken out of court, the person authorized to admit to bail in criminal cases" must return "a proper recognizance to the proper court"); *Modern Fin. Co.* v. *Martin*, 311 Mass. 509, 510 (1945) ("A recognizance is an obligation of record . . ."). The existence of a surety relationship therefore is not "peculiarly within the knowledge of the defendant." Model Penal Code § 1.12(3)(c). A defendant claiming lawful authority as a surety, such as the defendant Lima in this case, therefore bears only the burden of raising the defense.

---

[18]The burdens fall differently here than they do, for example, in criminal cases concerning controlled substances and firearms. In those cases, the defendant has the burden of proving lawful authority to possess or distribute. See, e.g., *Commonwealth* v. *Jefferson*, 377 Mass. 716, 717-719 (1979) (controlled substances); *Commonwealth* v. *Jones*, 372 Mass. 403, 406 (1977) (firearms). A statutory presumption of lack of authority applies in those cases. See G. L. c. 278, § 7 ("A defendant in a criminal prosecution, relying for his justification upon a license . . . or authority, shall prove the same; and, until so proved, the presumption shall be that he is not so authorized"). To overcome this presumption, a defendant must prove, through evidence such as a license or prescription, that he comes under a provision in the relevant statutes setting forth certain exemptions or exceptions. See, e.g., *Commonwealth* v. *Jefferson*, *supra* at 718. Here, the kidnapping statute's "without lawful authority" element, and the element of "without justification" in assault and battery, do not permit placing the burden of proof on the defendant. See notes 16-17, *supra*.

Once the surety raises the defense, the Commonwealth must prove beyond a reasonable doubt that he was not a surety.[19]

In contrast, a defendant claiming lawful authority as a surety's agent does raise an affirmative defense because it "involves a matter of . . . justification peculiarly within the knowledge of the defendant on which he can fairly be required to adduce supporting evidence." *Id.* It would be peculiarly difficult for the Commonwealth to prove that a defendant was not an agent of a surety, particularly if neither the defendant nor the surety testifies.[20] It is therefore entirely appropriate to require a defendant claiming to act as the agent of a surety to produce evidence of the agency relationship, including the scope of the agency relationship. See *id.*, comment 3 (where basis for defense "is so specially within the cognizance of the defendant, . . . it is fair to call on him to offer evidence if the defense is claimed"). In short, a defendant claiming to have the lawful authority to apprehend, detain, and deliver a surety's principal because he is acting as an agent of the surety is entitled to a jury instruction on this defense only if there is evidence sufficient for a rational jury to find that he was a surety's agent. Cf., e.g., *Commonwealth* v. *Lopes*, *supra* ("A defendant is entitled to an instruction on the use of nondeadly force if any view of the evidence . . . would support a finding that non-

---

[19]On the record before us, although the defendant Gonsalves claimed that the principal had "run out on *my* bail," he appears not to be a surety because his name does not appear on either of the principal's recognizance forms contained in the record. See note 10, *supra*. Although we express no view whether Gonsalves acted as an agent, it appears that neither of the principal's sureties was involved personally in the principal's capture and overnight detention. The defendant Lima's personal involvement apparently began only when he transported the principal to the court house the morning after his capture. See notes 7-8, *supra*, and accompanying text.

[20]Many States require sureties who use "bail recovery agents" to establish the agency relationship in writing, and limit the class of individuals who may act as agents. See, e.g., N.Y. Crim. Proc. Law § 530.80 (McKinney 1995) (permitting surety "by a written authority indorsed on a certified copy of the bail bond," to "empower any person over twenty years of age" to surrender principal); Ohio Rev. Code Ann. § 2713.22 (West 1994) (permitting surety "by a written authority indorsed on a certified copy of the bond," to "empower any person of suitable age and discretion" to surrender principal). States also have required anyone acting as a bail recovery agent to be so licensed. See, e.g., Conn. Gen. Stat. § 29-152e (2003); Miss. Code. Ann. § 83-39-3 (1999 & 2004 Supp.).

deadly force was, in fact, used in self-defense"). With respect to a defendant who claims to be an agent, if he satisfies this burden of production, the Commonwealth must prove beyond a reasonable doubt that the agency relationship did not exist or that the defendant acted outside the scope of the agency relationship. Here, as with a surety, the Commonwealth may prove that the agent acted beyond his "lawful" authority, which we next address.

3. *Scope of lawful authority.* The common law places limits on the extent of the force a surety may use to apprehend, detain, and surrender his principal. As we have previously noted, a surety may not "shackle[], confine[], or impede[] [the principal] in his daily movements," even though the Commonwealth may so restrict defendants in its custody. *Commonwealth* v. *Stuyvesant Ins. Co.*, 366 Mass. 611, 615 (1975). Rather, the bail arrangement "implies only that the surety obtains sufficient control over the principal to assure his appearances, to prevent disappearances, and to surrender the principal in discharge of the surety's obligation to the Commonwealth." *Id.* Our cases therefore have authorized only those measures "necessary" to obtain "sufficient control over the principal" to enable the surety to conduct the surrender. *Commonwealth* v. *Brickett*, 8 Pick. 138, 141 (1829). See *Commonwealth* v. *Stuyvesant Ins. Co.*, *supra.* Because the extent of a surety's use of force was not an issue in those cases, we did not explicate the standard for determining the bounds of a surety's lawful authority for the use of force in apprehending and delivering a principal. To do so now, we may look to analogous situations.

One such analogous situation concerns the arrest of a person by a private citizen.[21] Two years after our decision in *Commonwealth* v. *Stuyvesant Ins. Co.*, *supra*, this court incorporated

---

[21]A surety's apprehension of a principal may occur after arraignment. It is therefore not an "arrest." Both arrest and apprehension of a principal, however, play a key role in the criminal justice system: they ensure that a defendant is in the custody of the State to face criminal charges. See *Commonwealth* v. *Stuyvesant Ins. Co.*, 366 Mass. 611, 614 (1975); Drimmer, When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System, 33 Hous. L. Rev. 731, 740 (1996). "In general the surety may do whatever an officer might do with a warrant for the defendant's arrest . . . [and] will incur a liability to the principal only if he takes means unnecessary or improper to effect the arrest and surrender."

into law Model Penal Code § 3.07 governing the use of force by private citizens in law enforcement. *Commonwealth* v. *Klein*, 372 Mass. 823, 830 (1977) (citizen's use of deadly force in making arrest).[22] Among other things, the code restricts the use of force to what the actor "believes . . . is immediately necessary to effect a lawful arrest." *Id.* We adopted that section of the code to guard "against the dangers of uncontrolled vigilantism and anarchistic actions." *Id.* at 829.

The same standard is applicable in the context of a surety's apprehension and detention of a principal. Although the code's test for whether the use of force is justified appears on its face to be subjective, in practice it is applied objectively. The comments to the code explain that beliefs arrived at through negligence or recklessness do not justify the use of force.[23] The comments also state that the unreasonableness of an actor's as-

---

Restatement of Security § 204 comment b (1941). In *Commonwealth* v. *Stuyvesant Ins. Co.*, *supra* at 619 & n.10, we cited with approval § 206(2) of this Restatement, which governs voluntary surrender of a defendant released under bail, as "directly in point" with the facts of that case.

[22]Model Penal Code § 3.07 provides, in pertinent part:

"Section 3.07. Use of Force in Law Enforcement.

"(1) *Use of Force Justifiable to Effect an Arrest.* Subject to the provisions of this Section and of Section 3.09 [governing mistake, recklessness and negligence], the use of force upon or toward the person of another is justifiable when the actor is making or assisting in making an arrest and the actor believes that such force is immediately necessary to effect a lawful arrest.

"(2) *Limitations on the Use of Force.*

"(a) The use of force is not justifiable under this Section unless:

"(i) the actor makes known the purpose of the arrest or believes that it is otherwise known by or cannot reasonably be made known to the person to be arrested; and

"(ii) when the arrest is made under a warrant, the warrant is valid or believed by the actor to be valid. . . ."

[23]Although "cast in terms of the actor's belief in the immediate necessity of his conduct," the justification is "subject to the operation of [§ ] 3.09(2) when the actor is reckless or negligent in forming his belief." Model Penal Code § 3. 07 comment 2. Yet "caution should be exercised in finding recklessness or negligence in forming the beliefs that are material to justification . . . ." Model Penal Code § 3.09 comment 2.

serted belief is evidence that it was not actually held. We have cast the test objectively, as have other courts. See *Julian* v. *Randazzo*, 380 Mass. 391, 396 & n.1 (1980) (implicitly applying code to police officers and concluding trial judge properly instructed jury that "[a] law enforcement officer authorized to make an arrest . . . may use such force as is reasonably necessary to effect the arrest . . ."); *Landrum* v. *Moats*, 576 F.2d 1320, 1329-1331 (8th Cir. 1978) (implicitly approving of jury instruction that explained code language by stating, "[i]n making an arrest, a police officer may use whatever force is reasonably necessary. Reasonable force is generally that amount of force which an ordinary, prudent and intelligent person with the knowledge and in the situation of the police officer would have deemed necessary under the circumstances . . ."); *Wagner* v. *Omaha*, 236 Neb. 843, 847-848 (1991) (construing identical language to mean that "a police officer in making an arrest must use only reasonable force, which is that amount of force which an ordinary, prudent, and intelligent person with the knowledge and in the situation of the arresting police officer would have deemed necessary under the circumstances"). Furthermore, as noted in *Commonwealth* v. *Klein, supra* at 831 n.7, the American Law Institute adopted an objective "reasonably necessary" test in the Model Code of Pre-Arraignment Procedure § 120.7 that "carries forward . . . Section 3.07 of the Model Penal Code," although "the wording of the Model Penal Code provision has been changed slightly to adapt it to the present context." Model Code of Pre-Arraignment Procedure § 120.7 (1975).[24]

Accordingly, in apprehending, detaining, and delivering a principal to a court or jailer, see G. L. c. 276, §§ 68, 69, a surety and his agents may use only such force as an ordinary, prudent, and intelligent person with the actor's knowledge would have believed necessary in the circumstances, which may in any event never exceed the force a police officer would be justified in using in executing an arrest.[25] For the same reasons

[24]Model Code of Pre-Arraignment Procedure § 120.7 (1975) provides, in pertinent part: "A law enforcement officer authorized to make an arrest by this Article may use such force as is *reasonably necessary* to effect the arrest . . . ." (emphasis supplied).

[25]A surety's authority to use force against his principal is not coextensive

that this general rule concerning the use of force in law enforcement applies to the capture of a principal by a surety and his agents, so should the specific rule that requires the actor to explain his actions before resorting to the use of force. See Model Penal Code § 3.07(2)(a)(1).[26] This rule mitigates the danger of self-defense reactions that could result in injury to the surety, his agents, the principal, or even innocent third-party bystanders.

In summary, assuming that any defendant is entitled to a jury instruction on "lawful authority," to prove as to each defendant that he did not act within the bounds of his lawful authority as a surety or surety's agent, the Commonwealth must prove beyond a reasonable doubt that the defendant used more force than an ordinary, prudent, and intelligent person with the defendant's knowledge would have believed necessary in the circumstances to capture and surrender the principal. Alternatively, the Commonwealth may prove that a defendant did not make known the purpose of the capture, did not believe that the purpose was otherwise known by the principal, and could have reasonably made the purpose known to the principal. See *id.*[27]

We answer Question 1 in the affirmative. We answer Ques-

---

with a police officer's authority to arrest. There may be instances where a police officer would be justified in using greater force to effect an arrest than would a surety apprehending the same individual. One reason for this is that a surety's financial interest in exonerating bail is often less compelling than a police officer's public safety interest in making an arrest. At a minimum, any acts that would lead to the finding that a police officer used excessive force would also lead to the finding that a surety exceeded his lawful authority to capture and detain the principal in analogous circumstances.

[26]See note 22, *supra.*

[27]The standards articulated in this opinion, which are not "unexpected and indefensible by reference to" the common law, apply retroactively. Cf. *Commonwealth* v. *Wilkinson,* 415 Mass. 402, 407 (1993), quoting *Bouie* v. *Columbia,* 378 U.S. 347, 354 (1964) ("[A] judicial construction of a criminal statute [that] is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' . . . must not be given retroactive effect"). Although we have explicated in greater detail the specific bounds of a surety's lawful authority to use force to capture and surrender his principal, the defendants concede that their lawful authority is bounded by "whether the means used to effect the surrender were reasonable under the circumstances," a concession entirely consistent with the test we describe

tion 2 as explicated above. The cases are remanded for further proceedings consistent with this opinion.

*So ordered.*

today. We leave unresolved whether the defendants gave the principal sufficient notice before using force against him, or, if they did not, whether the notice requirement is "unexpected and indefensible" by reference to the common law. *Id.*